



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed May 28, 2020

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Richmond Health Facilities – Madison, L.P. | § | Case No. 17-44661-mxm |
| *et al.*, | § | |
| | § | |
| Debtors. | § | |
| | § | |

---

| | | |
|---|---|---|
| Richmond Health Facilities – Madison, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 19-4085-mxm |
| | § | |
| Wilkes & McHugh, P.A. *et al.*, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING IN PART AND DENYING IN PART**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
*Relates to Adv. ECF No. 26*

Before the Court is *Plaintiff's Motion for Summary Judgment* (the "**Motion**") filed by Richmond Health Facilities—Madison, L.P. ("**Richmond**").[1] Richmond seeks a determination that (a) two payments it made prior to bankruptcy to settle litigation are avoidable preferences under § 547 of the Bankruptcy Code, and (b) Richmond may recover from the Defendants[2] under § 550 of the Bankruptcy Code because they are either initial transferees or subsequent transferees who gave no value for their transfers. The summary-judgment record demonstrates that the settlement payments are avoidable under § 547, but the Court will require additional evidence and briefing at trial regarding recovery of the payments under § 550. The Court therefore grants the Motion in part and denies it in part.

## I.   JURISDICTION AND VENUE

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), and (O). Venue is proper pursuant to 28 U.S.C. § 1409(a). The Court has constitutional and statutory authority to enter a final judgment in this matter.

## II.   UNDISPUTED FACTS[3]

### A.  Description of the Debtors[4]

On November 13, 2017 (the "**Petition Date**"), Preferred Care Inc. and certain of its debtor affiliates, including Richmond (collectively, the "**Debtors**"), filed for Chapter 11 bankruptcy relief.

---

[1] Adv. ECF No. 26.

[2] Jane Olinger, as Administratrix of the Estate of Raleigh Olinger, deceased (the "**Olinger Estate**"); Wilkes & McHugh, P.A. ("**W&M**"); O'Brien Batten & Kirtley, PLLC ("the "**O'Brien Firm**"); and Jane Olinger, Gail Olinger, Steven Olinger, Eric Olinger, William Layne, Anthony Layne, Cynthia Layne, Jacquetta Lynn Lewis, and Sherree D. Lewis (collectively, the "**Olinger Heirs**") (together with the Olinger Estate, W&M, and the O'Brien Firm, the "**Defendants**" and each a "**Defendant**").

[3] Not all the facts included here are material, but they are included for background.

[4] The information in sections II.A. through II.C, and much of the information in section II.D, is from the *Declaration of Alan Weiner in Support of First-Day Motions* (the "**Weiner Declaration**"), ECF No. 22, Case No. 17-44642; also found at Adv. ECF No 27-3 ("**Pl.'s App.**") Tab 13. To avoid unnecessary clutter, the Court will footnote in sections

The Debtors, other than Preferred Care Inc., operated thirty-three skilled nursing facilities in the states of Kentucky and New Mexico.  Their nondebtor affiliates operated an additional seventy-five skilled nursing facilities in ten additional states.  Accordingly, the Debtors and their nondebtor affiliates (collectively, the "***Preferred Care Group***") operated 108 skilled nursing, assisted living, and independent living facilities (the "***Facilities***") in twelve states (approximately 11,500 beds).  As of the Petition Date, there were approximately 9,300 residents in the Preferred Care Group Facilities.

Each of the Debtors, other than Preferred Care Inc., is a Texas limited partnership.  As to each Debtor, a Texas limited liability company functions as the 1% general partner and Mr. Thomas Scott is the 99% limited partner.

Twenty-one of the Debtors operated twenty-one skilled nursing facilities in Kentucky.  Twelve of the Debtors operated twelve skilled nursing facilities in New Mexico.

Preferred Care Inc. is a Delaware corporation owned by Mr. Thomas Scott.  Preferred Care Inc. is a holding company for numerous wholly owned, nondebtor subsidiaries.  Preferred Care Inc., indirectly through its subsidiaries, owns four mental health facilities located in Mississippi, a developmental facility in Florida, and a management contract for a skilled nursing home in Texas.

The bankruptcy filings were necessitated by personal-injury litigation filed in Kentucky and New Mexico.  As of the Petition Date, there were approximately 163 lawsuits pending against Preferred Care Inc. and/or the Preferred Care Group—ninety-seven pending in Kentucky and twenty-seven pending in New Mexico.

---

II.A through II.D only the information that does *not* come from the Weiner Declaration.  The information in the Weiner Declaration was as of the Petition Date.

## B.  Management

Each of the limited partnership's operating facilities in Kentucky and New Mexico entered into management agreements with an unaffiliated management company to provide management services for their facilities.  The management companies have, in turn, entered into contracts with PCPMG Consulting, LLC ("***PCPMG Consulting***") to manage the non-clinical, day-to-day operations of each Debtor facility and to provide accounting, human resources, payroll, insurance, collections, and vendor payment services.  The Debtors pay the management companies 4% of their gross revenues as a management fee, plus the reimbursement of certain expenses.

The Debtors' employees located at the facilities provided the nursing and rehabilitation care to the residents.  The Debtors employed approximately 2,545 total employees across thirty-three facilities in Kentucky and New Mexico, including registered nurses, licensed vocational nurses, certified nursing aides, therapists, social services staff, and administrators.

## C.  Wells Fargo Financing

On March 10, 2017, the Preferred Care Group and Facility Support Funding, LLC ("***FSF***"), jointly and severally (collectively, the "***Borrowers***"), entered into that certain Credit Agreement with Wells Fargo Bank, National Association ("***Wells Fargo***") as Administrative Agent for Wells Fargo and other associated lenders.  Pursuant to the Credit Agreement, Wells Fargo agreed to make a $60 million revolving loan, subject to availability under the agreement, to FSF and the Preferred Care Group, secured by a first-priority security interest in all of the accounts receivable of the Debtor borrowers.  As of the Petition Date, the Preferred Care Group owed Wells Fargo approximately $40 million under the revolving line of credit, secured by, among other assets, accounts receivable of the Preferred Care Group aggregating approximately $80 million.

4

### D. Cash Management System

The Preferred Care Group utilizes a centralized cash management system (the "***Cash Management System***") similar to those commonly employed by corporate enterprises of comparable size and complexity. All revenues collected by each of the entities in the Preferred Care Group are eventually consolidated into FSF accounts located at Wells Fargo. Eighty-five percent of collections are from Medicare, Medicaid, and private insurers, which are deposited directly into an FSF concentration account at Wells Fargo (the "***Concentration Account***"). Fifteen percent of collections are private-pay receipts deposited into local facility-level accounts (the "***Depository Accounts***"), which are then transferred periodically into the Concentration Account. All amounts in the Concentration Account are then applied to the Wells Fargo line of credit as discussed below. FSF then draws on the Wells Fargo line of credit and uses those funds as needed for payroll and other operating expenses of the Preferred Care Group.

In addition to the Depository Accounts held by each facility in the Preferred Care Group, each Debtor limited partnership generally has two other accounts: a petty cash account (the "***Petty Cash Account***") and a trust fund account to hold the resident's personal funds (the "***Resident Account***"). The Resident Accounts are generally located at major national banks like Wells Fargo and Citibank, while the Depository and Petty Cash Accounts are located at smaller regional or local banks. At any given time, the amounts located in the Petty Cash and Resident Accounts are relatively small.

On the payables-side of the Cash Management System, when payables came due for any and all of the 108 operating entities, including Richmond, they would be paid via loan draw-monies deposited into an FSF account (the "***FSF A/P Account***").[5]  FSF is designated to be the only

---

[5] Patterson Dep. 17:16-20, Adv. ECF No. 47 ("***Defs.' App.***") Tab 10.

recipient of all loan draws within the cash management system.[6] When a draw needs to be made, PCPMG Consulting employees (as agents for FSF) make aggregate requests to Wells Fargo to cover the obligations of "all entities within the Preferred Care Group" and the funds are then deposited into the FSF A/P Account.[7] There are no written policies and procedures that govern what needs to be included in a request for loaned funds to be sent to the FSF A/P Account.[8] Wells Fargo does not even know on whose behalf within the Preferred Care Group the request for funds is being made.[9] All of the entities involved in the Cash Management System were liable on the borrowed funds.

PCPMG Consulting, the Debtors' management company, maintains a detailed accounting of all collections deposited into the Concentration Account and all advances drawn from the Wells Fargo line of credit and deposited into the FSF A/P Account. These accountings detail the entity within the Preferred Care Group for whom such collections were received and deposited into the Concentration Account and for whom such advances were drawn from the Wells Fargo line of credit and deposited into the FSF A/P Account. Additionally, PCPMG Consulting provides accounting for each entity in the Preferred Care Group for expenses, including payroll, paid on their behalf by FSF and/or FSF II. A schematic showing the Cash Management System is attached as Exhibit E to the Weiner Declaration.

The Cash Management System permits the Debtors to accurately monitor cash availability and track the collection and transfer of funds, including intercompany transfers, thereby reducing administrative burdens and expenses. The Debtors maintain current and accurate records of all

---

[6] Patterson Dep. 28:11-15, Defs.' App. Tab 10.

[7] Patterson Dep. 28:19-29:9, Defs.' App. Tab 10.

[8] Patterson Dep. 29:10-13, Defs.' App. Tab 10.

[9] Patterson Dep. 29:20-22, Defs.' App. Tab 10.

transactions processed through the Cash Management System, including intercompany obligations.

## E. The State Court Litigation and Settlement

On March 3, 2015, the Olinger Estate commenced a negligence suit in the Circuit Court of Madison County, Kentucky (the "*State Court Case*") against Preferred Care, Inc.; Richmond; Richmond Health Facilities-Madison GP, LLC; Kentucky Partners Management, LLC; Thomas Scott; and Roy T. Baber, in his capacity as Administrator for Richmond ("*State Court Defendants*").[10]   In the State Court Case, the Olinger Estate sought damages under various Kentucky statutes arising from injuries and wrongful death allegedly suffered by Mr. Raleigh Olinger during his residency at Richmond's facility.[11]

W&M was counsel for the Olinger Estate in the State Court Case, having been retained by the Olinger Estate in August 2014 on a contingency basis.[12]   The Olinger Estate and W&M also signed a "Referral Agreement" in August 2014 with the O'Brien Firm pursuant to which W&M and the O'Brien Firm agreed to share in any contingency recovery.[13]

On April 20, 2017, the parties-in-interest reached a settlement in principle after substantial litigation.[14]   A general release and settlement agreement (the "*Settlement Agreement*") memorializing the settlement was executed on June 22, 2017, by Jane Olinger, "as Administratrix of the ESTATE OF RALEIGH OLINGER, deceased, and, on behalf of the wrongful death

---

[10] Defs.' App. Tab 1.  The State Court Action is styled *Jane Olinger, as Administratrix of the Estate of Raleigh Olinger, deceased v. Madison Health & Rehab Center, et al.*, Madison County Circuit Court Civil Action No.: 15 - CI -0133. After the filing of the original complaint, State Court Defendant Thomas Scott was voluntarily dismissed without prejudice and Preferred Care Partners Management Group, LP and PCPMG, LLC were added as party-defendants.

[11] Defs.' App. Tab 1.

[12] Adv. ECF No. 53 ("*Pl.'s Supp. App.*") Tab 21.

[13] Pl.'s Supp. App. Tab 22.

[14] Defs.' App. Tab 2.

beneficiaries of RALEIGH OLINGER (the 'Releasors')."[15]  "Releasors" in turn was defined to include, among other persons, heirs and attorneys.[16]  The Settlement Agreement provided that, in exchange for $1,500,000.00, payable in six equal installments of $250,000.00, the Releasors would release the following "Releasees" from any and all claims the Releasors may have, "including but not limited to" claims made in the State Court Case:  Richmond; Preferred Care, Inc. D/B/A Preferred Care of Delaware, Inc.; Richmond Health Facilities-Madison GP, LLC; Kentucky Partners Management, LLC; Preferred Care Partners Management Group, LP; PCPMG, LLC; and Roy T. Baber, in his capacity as Administrator of Richmond (collectively, the "*State Court Releasees*").[17]  Under the Settlement Agreement, the "Releasors represent[ed] to the Releasees that Releasors and Releasors' attorneys are the only ones entitled to the settlement funds and that there are no liens or claims made against these funds by any other party . . . ."[18]  In addition, "Releasors warrant[ed] and represent[ed] that Jane Olinger is the sole, duly authorized, Administratrix of the Estate of Raleigh Olinger and in said capacity has full authority to effect settlement in this matter, having the authority to bind all real parties in interest including the wrongful death beneficiaries whom the undersigned represents . . . ."[19]

The agreed mode of delivery under the Settlement Agreement for each settlement installment payment was via a "check made payable to the Wilkes & McHugh, P.A. Trust Account [the "*W&M Trust Account*"] received from or on behalf of [all of the State Court Releasees]."[20] On June 30, 2017, prior to receipt of any installment payment from or on behalf of the State Court

---

[15] Defs.' App. Tab 3, at 1.

[16] *Id.*

[17] *Id.* at 1-2.

[18] *Id.* at 2.

[19] *Id.* at 4.

[20] *Id.* at 1.

Releasees, Jane Olinger executed a Settlement Statement regarding the settlement funds that were to be sent to the W&M Trust Account.[21]

## F. Payments and disbursements pursuant to the Settlement Agreement and Settlement Statement

After the Settlement Agreement and Settlement Statement were signed, counsel for the State Court Releasees, Quintairos, Prieto, Wood & Boyer, P.A., sent each installment check under the Settlement Agreement to W&M.[22]  Three of the six installment checks were sent in this fashion before Richmond and certain State Court Releasees (including Preferred Care, Inc.) filed for bankruptcy protection on November 13, 2017.

The first installment check for $250,000.00, dated July 28, 2017, was sent outside of the ninety-day preference window and is not at issue.  For the two installment payments at issue, checks of $250,000.00 each were sent via hand delivery on August 28, 2017 (check number 1300137, dated 8/23/2017) and September 29, 2017 (check number 1309002 dated 9/28/2017), respectively.[23]

Each installment check has "Madison Health & Rehab Center"—the d/b/a name of Richmond—in the upper left-hand corner.  Each check is signed by Mindy Provence—a principal of PCPMG Consulting—and each check was drawn on a Wells Fargo Bank account ending in 6797, which is the FSF A/P Account.[24]

FSF, a nondebtor, owned legal title to the FSF A/P Account and—unlike Richmond—had the *direct* ability to make withdrawals from the account.[25]  Given that Richmond did not own *legal*

---

[21] Defs.' App. Tab 4. The contents of the Settlement Statement are detailed in Pls Supp. App. Tab 24, which has been sealed.  *See* Adv. ECF No. 53.

[22] Defs.' App. Tab 9.

[23] *Id.*

[24] *Id.*

[25] Patterson Dep. 17:16-23; 63:12-25; 67:1-3, Defs.' App. Tab 10.

title to the FSF A/P Account, Richmond did not list the account itself in Richmond's bankruptcy schedules,[26] but it did disclose the two $250,000 transfers at issue in its Statement of Financial Affairs as transfers of Richmond's property to creditors within ninety days prior to bankruptcy.[27]

The W&M Trust Account reflects the following deposits into, and disbursements from, the account:[28]

| Date | Check Number | Description[29] | Amount |
|------|--------------|-----------------|--------|
| 8/31/2017 | 1300137 | Check from Richmond to W&M for settlement payment 2 of 6 | $250,000 |
| 9/15/2017 | 124053 | Check to W&M operating account for fees from payment 2 of 6 | ($84,331.96) |
| 9/15/2017 | 124054 | Check to O'Brien Firm for referral fees from payment 2 of 6 | ($36,142.27) |
| 9/15/2017 | 124055 | Check to Jane Olinger, as Administratrix of the Olinger Estate, for net disbursement to client from payment 2 of 6 | ($129,525.77) |
| 10/3/2017 | 1309002 | Check from Richmond to W&M for settlement payment 3 of 6 | $250,000 |
| 10/9/2017 | 124092 | Check to W&M operating account for fees from payment 3 of 6 | ($84,331.96) |

---

[26] Patterson Dep. 91:1-8, Defs.' App. Tab 10; *see also* ECF No. 12, at 18/47, Case No. 17-44661.

[27] ECF No. 15, at 8/34, 26/34, Case No. 17-44661.

[28] Pl.'s App. Tab 10.

[29] The descriptions are the Court's summary descriptions of what is in the account statement.

| 10/9/2017 | 124093 | Check to O'Brien Firm for referral fees from payment 3 of 6 | ($36,142.27) |
|---|---|---|---|
| 10/9/2017 | 124094 | Check to Jane Olinger, as Administratrix of the Olinger Estate, for net disbursement to client from payment 3 of 6 | ($129,525.77) |
| 10/9/2017 | 124095 | Medicare for Medicare Lien | ($5,997.35) |

The Olinger Estate, an intestate estate, distributed the $259,051.54 of funds it received from the W&M Trust Account ($129,525.77 x 2) to the Olinger Heirs, Mr. Raleigh Olinger's heirs at law.[30]

## G. How Richmond processed the settlement payments

According to Richmond, the following standard Preferred Care Group cash management system and accounting procedures were used to process the Olinger Estate settlement:[31]

- all revenues of Richmond are deposited into the Concentration Account; an inter-company loan is then booked from Richmond to FSF, and recorded as a payable from FSF to Richmond in an amount equal to the revenues deposited into the FSF account;

- Robert Riek, who provides in-house-counsel services to the Preferred Care Group, managed the Olinger Estate litigation on behalf of Richmond, and approved the Olinger Estate settlement;

---

[30] Defs.' App. Tabs 7, 8.

[31] Adv. ECF No. 27-2 ("*Patterson Aff.*") ¶ 5, at 2-3.

- each $250,000 settlement payment required under the Settlement Agreement was requested by Mr. Riek's office submitting an "Account Payable Manual Check Request" form (the "***Check Request***")[32] to the office of Thomas Patterson, the Chief Financial Officer of PCPMG Consulting;

- upon receipt of each Check Request, Mr. Patterson's office booked a payable on the books and records of Richmond, from Richmond to the Olinger Estate[33] for each requested $250,000 payment;[34]

- Mr. Patterson's office then caused FSF to draw on the Wells Fargo line of credit for the requested amount and deposited those funds in the FSF A/P Account;

- PCPMG Consulting recorded the settlement amounts as inter-company loans from FSF to Richmond[35] and issued the settlement checks as directed and on behalf of Richmond reflecting that they are from Richmond;[36]

- the inter-company payable by FSF to Richmond (created when Richmond deposits its revenues in the FSF Concentration Account) was offset from time to time against the FSF inter-company accounts receivable from Richmond (created when FSF paid Richmond's expense payments on behalf of Richmond, including expense payment on the Olinger Estate settlement on behalf of Richmond); and

- Richmond controls the disposition of funds available to it from the Wells Fargo line of credit, utilizing FSF as an intermediary to efficiently manage, transfer, and

---

[32] *See* Pl.'s App. Tabs 15 and 16.

[33] The actual documents refer to W&M as opposed to the Olinger Estate.

[34] *See* Pl.'s App. Tabs 17 and 18.

[35] *See* Pl.'s App. Tabs 17 and 18.

[36] *See* Pl.'s App. Tabs 2 and 6.

account for funds on its behalf and as directed by Richmond. FSF does not independently determine which Richmond creditors get paid nor determine how much a Richmond creditor gets paid.

## H. Litigation against the Defendants

On August 8, 2019, Richmond initiated this adversary proceeding, seeking to avoid and recover alleged preferential and fraudulent transfers under the Bankruptcy Code.[37] Richmond filed first and second amended complaints to add party-defendants from whom recovery was sought.[38] The responding Defendants filed answers to the complaints and asserted defenses to Richmond's entitlement to recovery under the Bankruptcy Code, including that (i) the transfers at issue were not of an interest of Richmond in property; (ii) Richmond's claims are legally insufficient under the earmarking doctrine; and (iii) Richmond cannot recover against the Defendants under 11 U.S.C. § 550(b).[39]

Discovery requests were then exchanged, and on November 21, 2019, Richmond filed a motion for protective order,[40] seeking to narrow discovery to the two issues for which it would seek initial summary judgment: (a) "Was the $500,000 paid through the Debtors' Cash Management System property in which Richmond owned an interest pursuant to § 547 of the Bankruptcy Code?" and (b) "Were the Wilkes Law Firm, the Olinger Estate and the O'Brien Law Firm initial transferees or subsequent transferees?"[41] On the same day, the parties filed a joint motion for entry of an agreed order modifying the scheduling order and continuing trial because Richmond's forthcoming motion on those issues may narrow the scope of discovery for both

---

[37] Adv. ECF No. 1.

[38] Adv. ECF Nos. 5, 13.

[39] Adv. ECF Nos. 20, 28.

[40] Adv. ECF No. 21.

[41] *Id.* at 2.

sides.[42] The Court granted the joint motion and tolled discovery and related deadlines pending resolution of Richmond's forthcoming summary-judgment issues.[43]

On December 6, 2019, Richmond filed its Motion and brief in support, along with an affidavit and appendix,[44] seeking partial summary judgment that—

(1) the alleged transfers at issue were of an interest in property of Richmond;

(2) each transfer was made within ninety days of the Petition Date;

(3) the transfers were made while Richmond was insolvent;

(4) the transfers were made for or on account of an antecedent debt owed by Richmond to the Olinger Estate before such transfers were made;

(5) the transfers allowed the Olinger Estate to receive more than it would have received if (a) Richmond's case were a case under chapter 7 of the Bankruptcy Code, (b) the transfers had not been made, and (c) the Olinger Estate received payment of its debt to the extent provided by the provisions of the Bankruptcy Code;

(6) W&M, the Olinger Estate, and the O'Brien Firm are initial transferees under 11 U.S.C. § 550; and

(7) the Olinger Heirs are subsequent transferees under § 550 who gave no value for the transfers they received.

---

[42] Adv. ECF No. 22.

[43] Adv. ECF No. 30.

[44] Adv. ECF No. 27 (brief); 27-2 (affidavit); 27-3 (appendix).

14

The Defendants have since filed their responses,[45] brief,[46] and appendices.[47]    The Defendants contested items (1), (6), and (7) but did not contest items (2) through (5).[48]    The Plaintiff filed its reply,[49] and the matter is now ripe for decision.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law.[50]    Summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.[51]    The moving party bears the burden of establishing that there are no genuine issues of material fact.[52]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim.[53]    The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.[54]    The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial.[55]

---

[45] Adv. ECF Nos. 45 and 48.

[46] Adv. ECF No. 46.

[47] Adv. ECF Nos. 47, 53.

[48] The summary-judgment record shows that these elements (2) through (5) are satisfied, so the Court will not discuss them further.

[49] Adv. ECF No. 54.

[50] FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056.

[51] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[52] *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).

[53] *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[54] *Id.*

[55] *Id.*

## IV.    ANALYSIS

The Court must determine if the summary-judgment record establishes as a matter of law (a) whether the alleged transfers at issue were of an interest in property of Richmond under § 547, (b) whether each Defendant is an initial transferee or subsequent transferee under § 550, and (c) if the Olinger Heirs are subsequent transferees, whether they gave value for their respective transfers.

### A.  The transfers were of an interest in property of Richmond

To avoid any of the post-settlement payments, Richmond has the burden to prove that the payments constituted transfers "of an interest of the debtor in property."[56]  A bankruptcy court's determination regarding whether the property transferred was "of an interest of the debtor in property" essentially turns on the level of control the debtor had over the property transferred.[57] Dominion or control in this context means "legal dominion or control" over the property.[58]

The uncontroverted summary-judgment evidence establishes that (i) Mr. Riek settled the litigation on behalf of Richmond and requested the settlement funds via the Check Request to PCPMG Consulting; (ii) PCPMG Consulting booked on Richmond's records a payable to the Olinger Estate and caused FSF to borrow the settlement funds from Wells Fargo and deposit the funds in the FSF A/P Account for Richmond's use; (iii) PCPMG Consulting recorded the settlement funds as an intercompany loan from FSF to Richmond and issued the settlement checks on Richmond's behalf; (iv) Richmond controlled the disposition of the borrowed funds; and (v) FSF does not independently determine which Richmond creditors get paid nor how much they get

---

[56] 11 U.S.C. § 547(b).

[57] *See Southmark Corp. v. Crescent Heights VI, Inc. (In re Southmark Corp.)*, 95 F.3d 53, 1996 WL 459958, at *4 (5th Cir. 1996) (unpublished) ("While it is true that the debtor's control of property may be such that the property is properly considered part of the debtor's estate in bankruptcy, our decisions make it clear that such control must be unfettered and without restriction.").

[58] *Id*. at *5 (internal citations and quotations omitted).

paid.   These facts establish that Richmond had unfettered and unrestricted control over the borrowed funds, so Richmond had a property interest in the settlement funds.[59]

To avoid this straightforward conclusion that Richmond controlled the funds, the Defendants make several arguments, none of which are persuasive.   First, citing one of the Fifth Circuit's *Southmark*[60] opinions, the Defendants point out that FSF—not Richmond—owned legal title to the FSF A/P Account.   Legal title to property is not controlling, however.   In *Southmark*, the Fifth Circuit determined that a preference check paid to a former executive out of a consolidated cash management system (similar to the one here) was the parent company's property for preference purposes when the company had legal title to the account, had full operational control over the account, had the ability to deplete the account for any reason it wanted, and had no agreements with its affiliated companies that limited its ability to use the funds in the account.[61] That the parent company had legal title to the account was one factor the court considered, but the court itself observed that the parent company's *control* over the *funds* was the critical factor, whether or not the parent owned the account.[62]

Second, the Defendants argue that because Richmond did not list the FSF A/P Account in its bankruptcy schedules, Richmond is judicially estopped from claiming ownership of the account.   But Richmond does not allege legal ownership of the account, so it had no reason to list the FSF A/P Account in its bankruptcy schedules.   Instead, Richmond properly disclosed the

---

[59] The Defendants rely on an affidavit by Vincenzo Toppi, who concludes that Richmond did not control the settlement funds and that Richmond's assets were not used to pay the Defendants. Adv. ECF No. 46, Ex. A ("**Toppi Aff.**") ¶¶ 11, 14, 21.g.  The Court disagrees with Mr. Toppi's conclusions.

[60] *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111 (5th Cir. 1995).

[61] *Id.* at 1114, 1116-17.

[62] *Id.* at 1116-17 & n.17 ("[I]t is undisputed that Southmark controlled the funds in the Payroll Account and that it could have paid them to anyone, including its own creditors.  For the purposes of preference law, therefore, the money in Southmark's Payroll Account is treated as part of Southmark's estate, *whether or not Southmark actually owns it.*").

transfer of the *settlement funds* in its statement of financial affairs as a transfer of Richmond's property in the ninety days prior to bankruptcy.

Third, the Defendants argue that Richmond lacked the ability to make withdrawals from the FSF A/P Account. Although Mr. Patterson testified that Richmond could not *directly* make withdrawals from the account,[63] Mr. Patterson was the CFO of PCPMG Consulting, the management company that managed Richmond's affairs, and Mr. Patterson was authorized under the Wells Fargo credit agreement to make draw requests on behalf the borrowers under the credit agreement, including FSF and Richmond.[64] Mr. Patterson and PCPMG Consulting were acting as agents on behalf of all the borrowers under the Wells Fargo Credit Agreement.[65] Mr. Patterson stated in his affidavit that "Richmond controls the disposition of funds available to it from the Wells Fargo line of credit, utilizing FSF as an intermediary to efficiently manage and transfer funds on its behalf and as directed by Richmond. FSF does not independently determine which Richmond creditors get paid nor determine how much a Richmond creditor gets paid."[66] Mr. Patterson also was clear in his deposition: "In this case, we just took direction from Madison representatives who wanted it [i.e., the settlement payments] paid by Madison."[67] The uncontroverted evidence is that Richmond—even though it could not *directly* make withdrawals from the FSF A/P Account—controlled the disposition of the settlement funds, acting through PCPMG Consulting, the management company, and using FSF as a financial intermediary.

---

[63] Patterson Dep. 17:16-23; 63:12-25, Defs.' App. Tab 10.

[64] Wells Fargo Credit Agreement, Defs.' App. Tab 10, part 2 at 493 (§ 2.3(a) regarding borrowing procedures provides that "Authorized Persons" can make borrowing requests), 663 (Mr. Patterson listed on schedule of Authorized Persons), 597 (FSF is a borrower), 599 (Richmond is a borrower).

[65] Patterson Dep. 36:11-13, Defs.' App. Tab 10.

[66] Patterson Aff. ¶ 5, Adv. ECF No. 27-2, at 2-3.

[67] Patterson Dep. 24: 1-2, Defs.' App. Tab 10.

18

Fourth, the Defendants highlight Mr. Patterson's testimony about two hypotheticals posed to him in his deposition: (a) if he received a request for funds from Richmond in the tens of millions of dollars for instance, he would not allow the money to be automatically dispersed;[68] and (b) there would not be an automatic disbursement to Richmond if it made a check request out to cash.[69] As for the first hypothetical, Mr. Patterson testified that he was not aware of anything that would preclude FSF from permitting that kind of borrowing, but that as a practical matter, since he (on behalf of PCPMG Consulting, the management company) was acting on behalf of both FSF and Richmond in the loan relationship with Wells Fargo, he would first require (in such an extreme example) some discussion about why the funds were being used.[70] As for the second hypothetical, Mr. Patterson testified that the management company (PCPMG Consulting) would not simply decline the proposed transaction but would question it and ask for backup documentation first given the unusual request.[71] Mr. Paterson's testimony—rather than demonstrating a lack of control by Richmond—merely shows that Richmond's affairs were handled by a diligent and responsible management company.

Fifth, the Defendants point to various accounts on the receivables side of the cash-management system that Richmond does not have unfettered control over even though Richmond's accounts receivable pass through those accounts. Richmond's control over those different accounts is not relevant to the issue here: Whether Richmond controlled the disposition of funds in the FSF A/P Account when the funds were loaned by FSF to Richmond and then paid to the Defendants. The evidence shows that Richmond had such control.

---

[68] Patterson Dep. 35:13-36:5, Defs.' App. Tab 10.

[69] Patterson Dep. 40:2-41:14, Defs.' App. Tab 10.

[70] Patterson Dep. 35-36, Defs.' App. Tab 10.

[71] Patterson Dep. 40-41, Defs.' App. Tab 10.

Sixth, the Defendants argue that other borrowers in the Preferred Care Group also used the FSF A/P Account when funding settlements of litigation against them.[72]   This fact merely highlights that FSF's ownership of the account is not dispositive.   What really counts is who had control over the funds in the account at a specific time.   Other borrowers may have had control over the funds in the FSF A/P Account when their settlements were funded, but Richmond had control over the funds in the account when *its* settlement was funded.

Seventh, the Defendants note that as of the Petition Date, Richmond was a "net borrower" to FSF under the Wells Fargo line of credit in the amount of $941,289.75—meaning it owed FSF that amount as a payable on the books.[73]   Therefore, as acknowledged by Mr. Patterson, repayment to Wells Fargo of the amounts borrowed for the Richmond settlement would have been by one of the other facilities that constructively was contributing more than it was borrowing.[74]   Richmond's negative balance did not in any way limit the money that was available to pay Richmond's creditors, however,[75] and the evidence shows that Richmond controlled the funds that it was permitted to borrow.

Eighth, the Defendants note that Mr. Patterson was not aware of anything that precluded FSF from making its own requests to draw on the Wells Fargo line of credit despite its general lack of accounts payable.[76]   FSF's ability to draw on the line of credit to pay hypothetical creditors of FSF does not mean that it controlled the settlement funds at issue, which the evidence shows were used as directed by Richmond to pay Richmond's creditors.

---

[72] Defs.' App. Tabs 11-13.

[73] Patterson Dep. 58:18-24, Defs.' App. Tab 10.

[74] Patterson Dep. 94:22-96:7, Defs.' App. Tab 10.

[75] Patterson Dep. 34:3-8; 58:25-59:3, Defs.' App. Tab 10.

[76] Patterson Dep. 36:25-37:9, Defs.' App. Tab 10.

Ninth, the Defendants argue that Richmond cannot recover against the Defendants due to the earmarking doctrine. That doctrine does not apply here. "The earmarking doctrine is a judicially created, equitable exception to § 547(b) that holds that money loaned to a debtor by a new creditor to pay an existing debt to an old creditor is not a 'transfer of an interest of the debtor in property.'"[77] But the doctrine does not apply in the Fifth Circuit when the debtor has discretion to determine which creditors to pay with the new loan proceeds.[78] The new lender's knowledge or understanding that a loan will be used to pay a particular creditor is not sufficient; there must be an agreement or other restriction that requires the debtor to use the new loan proceeds to pay a particular creditor.[79] In this case, there is no evidence that FSF required that any particular creditor be paid with the loan proceeds; to the contrary, Mr. Patterson's affidavit shows without contradiction that "FSF does not independently determine which Richmond creditors get paid nor determine how much a Richmond creditor gets paid."[80] The earmarking doctrine does not apply under these facts.

## B. The Court will determine at trial the status of each Defendant as an initial transferee or subsequent transferee

Bankruptcy Code § 550 prescribes the rights and liabilities of a transferee of an avoided transfer. Subsection (a) permits a trustee to recover the property transferred, or value of the property transferred, from the initial transferee of an avoided transfer or any immediate or mediate

---

[77] *In re Entringer Bakeries, Inc.*, 548 F.3d 344, 347 n. 3 (5th Cir. 2008) (quoting *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1356 (5th Cir.1986)).

[78] *In re Entringer Bakeries, Inc.*, 548 F.3d at 350-51 & n.6; *In re Martin Wright Electric Company*, 2008 WL 114928 at *5-6 (Bankr. W.D. Tex. 2008); *In re Philip Servs. Corp.*, 359 B.R. 616, 629-30 (Bankr. S.D. Tex. 2006).

[79] *In re Entringer Bakeries, Inc.*, 548 F.3d at 350-51 & n.6; *In re Martin Wright Electric Company*, 2008 WL 114928 at *5-6; *In re Philip Servs. Corp.*, 359 B.R. at 629-30.

[80] Patterson Aff. ¶ 5, at 2-3. The same is true even if Wells Fargo is deemed to be the relevant lender. It is undisputed that Wells Fargo does not know what specific business purposes loan requests are for. Patterson Dep. 29:20-22, Defs.' App. Tab 10.

transferee ("subsequent transferee") of the initial transferee.[81]  A trustee's recovery of property, however, may be circumvented by a subsequent transferee who takes for value, in good faith, and without knowledge of the voidability of the transfer.[82]

To determine the scope of the Defendants' potential liability for the avoided settlement payments, the Court must determine whether each Defendant is an initial transferee or a subsequent transferee.  The term "transferee" is not defined in the Bankruptcy Code, but the Fifth Circuit has adopted a "dominion or control" test to determine whether a party is an "initial transferee" of a preferential transfer for purposes of § 550(a).[83]  Under the dominion or control test, a party is not considered an initial transferee of a transfer received directly from the debtor unless that party gains actual dominion or control over the funds.[84]  When an intermediary party receives but does not gain actual dominion or control over the funds, that party is considered a mere conduit or agent for one of the real parties to the transaction.[85]  Dominion or control over the money or other asset means having the right to put the money to one's own use for whatever purpose the recipient so desires.[86]

---

[81] 11 U.S.C. § 550(a)(1) and (2).

[82] 11 U.S.C. § 550(b)(1).

[83] *See Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 141 (5th Cir. 1993).

[84] *Id.*

[85] *Id.* at 141 n. 3; *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1200 (11th Cir. 1988).

[86] *Coutee*, 984 F.2d at 141 (citing *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).  Both Richmond and the Defendants cite *Coutee* in their favor, but other than being helpful for establishing the dominion-and-control test, the case simply is not on point factually.  The client in *Coutee* settled personal-injury litigation with a third party, received a settlement check, and endorsed the settlement check to its personal-injury law firm, which deposited the funds in its trust account.  *Id.* at 139-40.  The firm then paid its fees from the funds, returned a portion of the award to the client, and paid the balance to a bank that had funded the litigation.  *Id.* at 140.  Two critical facts distinguish *Coutee* from this case.  First, it was the *client* (not the litigation defendant) that then filed for bankruptcy, so the court never had to address whether the client was an initial transferee of the settlement funds—in other words, the debtor cannot be an initial transferee and recover funds against itself.  Second, and equally important, the Chapter 7 trustee did not sue the law firm to recover the funds *the law firm* received as a preference; instead, the trustee sued the bank to recover the funds the *bank* received as a preference.  The bank asserted in its defense that the law firm was the initial transferee (and the bank a subsequent transferee) since the settlement funds the bank received were transferred first to the attorney's trust account.  In that context, the Fifth

The Court concludes that it should determine at trial—with the benefit of evidence and additional briefing—the status of each Defendant as an initial transferee or subsequent transferee. The Court has two concerns. First, the language in the Settlement Agreement complicates the initial/subsequent-transferee issue because (a) Jane Olinger signed the Settlement Agreement as Administratrix of the Olinger Estate *and* on behalf of the wrongful-death beneficiaries of Raleigh Olinger; (b) the "Releasors" released any claims they may have in exchange for the settlement payments, and "Releasors" expressly includes heirs and attorneys; (c) the "Releasors" represented that the Releasors *and their attorneys* were the only ones entitled to the settlement funds and that there were no liens or claims made against the funds by any other party; and (d) Jane Olinger represented and warranted that she was authorized to effect settlement of the matter and "bind all real parties in interest including the wrongful death beneficiaries" she represented.[87] The Settlement Agreement and related Settlement Statement—which appears to potentially recognize the interests claimed in the funds by W&M, the O'Brien Firm, and the Olinger Heirs—raise serious issues about which Defendant or Defendants had a direct interest in the settlement payments received from Richmond and which Defendants may have been initial transferees by virtue of authorizing Jane Olinger to accept the settlement funds on their behalf.

Second, the Kentucky Supreme Court Rule of Professional Conduct regarding safekeeping property prohibits an attorney from releasing all litigation settlement funds in the attorney's possession to the client when the attorney knows a third party claims an interest in the funds.[88]

---

Circuit concluded that the law firm was a mere conduit for the settlement funds that were delivered to the bank, which was the initial transferee of those funds. No party in this case is arguing that W&M is an initial transferee of the funds that ultimately were disbursed from the W&M Trust Account to another party.

[87] Settlement Agreement at 1-2, 4, Defs.' App. Tab 3.

[88] *See* Kentucky Rule of Prof. Conduct 3.130(1.15); *see also Aulenbach v. Kentucky Bar Ass'n,* 398 S.W.3d 435 (Ky. 2013) (suspending attorney from practice of law for violating Rule 3.130(1.15) when attorney disbursed all litigation settlement funds in the firm's trust account to the client even though attorney knew the client promised to pay a portion of the settlement funds to the client's creditor).

Here, based on the current briefing and summary-judgment record, given the potential claims to the settlement funds by W&M, the O'Brien Firm, and the Olinger Heirs, a factual dispute exists concerning (as the Defendants argue) whether the Olinger Estate—and no other Defendant—had dominion and control over the proceeds of the two $250,000 settlement checks deposited into the W&M Trust Account.

The Court is not prepared to rule on these issues without additional briefing and evidence at trial.

## C. The Court will determine at trial, if necessary, whether the Olinger Heirs, if they were subsequent transferees, gave value for their respective transfers

For the reasons stated above, the Court is not prepared to rule on whether each Defendant was an initial transferee or subsequent transferee under § 550. If and when the Court determines after trial that the Olinger Heirs (or any of the other Defendants) were subsequent transferees, then the Court will address whether any such Defendants took their transfers for value, in good faith, and without knowledge of the voidability of the transfers avoided.

## V.    CONCLUSION

For the reasons stated above, the Court **ORDERS** as follows:

1. The Motion [Adv. ECF No. 26] is **GRANTED** in part and **DENIED** in part as set forth above.

2. The following elements of 11 U.S.C. § 547 are established for purposes of trial:

   a. the alleged transfers at issue were of an interest in property of Richmond;

   b. each transfer was made within ninety days of the Petition Date;

   c. the transfers were made while Richmond was insolvent;

   d. the transfers were made for or on account of an antecedent debt owed by Richmond to the Olinger Estate before such transfers were made;

    e.   the transfers allowed the Olinger Estate to receive more than it would have received if (i) Richmond's case were a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the Olinger Estate received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

3. All issues related to 11 U.S.C. § 550 are reserved for trial.

### END OF ORDER ###