**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| Wilkes & McHugh, P.A. *et al.*, § | | |
| § | | |
| *Defendants-Appellants*, § | | Civil Action No. _____ |
| § | | |
| vs. § | | Motion for Interlocutory Appeal of |
| § | | Adversary No. 19-04085-mxm, Dkt. 56. |
| § | | |
| Richmond Health Facilities –Madison, L.P., § | | |
| § | | |
| *Plaintiff-Appellee*. § | | |

**DEFENDANTS' MOTION FOR LEAVE TO
APPEAL INTERLOCUTORY ORDER**

Defendants Wilkes & McHugh, P.A.; Jane Olinger, as Administratrix of the Estate of Raleigh Olinger; as Administratrix of the Estate of Gail Olinger; Jane Olinger, individually; Steven Olinger; Eric Olinger; Jacquetta Lynn Lewis; and Sheree D. Lewis ("Movants") hereby file this Motion for Leave to Appeal Interlocutory Order ("Motion") pursuant to 28 U.S.C. 158(a)(3) and Rule 8004 of the Federal Rules of Bankruptcy Procedure. Movants seek to appeal from the interlocutory order for partial summary judgment entered May 28, 2020 [Docket No. 56] ("Order") by the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. Specifically, Movants seek to appeal the Bankruptcy Court's summary judgment ruling that monies paid over to a creditor (the Olinger Estate) of debtor Plaintiff Richmond Health Facilities-Madison, L.P. ("Richmond") **(1)** were property of Richmond's bankruptcy, but **(2)** were not earmarked funds subject to the Earmarking Doctrine, and thus were monies potentially subject to recoupment by Richmond's bankruptcy estate as preference payments. In sum, the funds at issue never passed through Richmond's hands, but were funds coming directly from an affiliated sister company with common management and ownership

with Richmond, and going directly to settle a dispute with the Estate of Raleigh Olinger. A copy of the Order is attached.

## I.  STATEMENT OF MATERIAL FACTS

### A.  The State Court Litigation and Settlement

On March 3, 2015, Movant-Defendant the Olinger Estate commenced a nursing home negligence suit in the Circuit Court of Madison County, Kentucky ("State Court Case") against Respondent-Plaintiff Richmond; as well as Preferred Care, Inc.; Richmond Health Facilities-Madison GP, LLC; Kentucky Partners Management, LLC; Thomas Scott; and Roy T. Baber, in his capacity as Administrator for Richmond ("State Court Defendants"). (Doc. 47, Appx. Tab 1). Movant-Defendant Wilkes & McHugh, P.A. served as counsel for the Olinger Estate in the State Court Case, via a referral agreement with referring attorneys, Defendant O'Brien & Kirtley, PLLC.

On November 13, 2017, Preferred Care, Inc., Richmond, and its General Partner,[1] along with a number of other Preferred Care entities, petitioned for Chapter 11 bankruptcy relief in the Bankruptcy Court of the U.S. District Court for the Northern District of Texas, in Case No. 17-44642. (*See* Doc. 13 at pp. 2, 4) These entities are jointly administered per a Bankruptcy Court order of November 27, 2017.

On April 20, 2017—roughly seven (7) months pre-bankruptcy petition—a settlement in principle was reached between the Olinger Estate and the State Court Defendants after substantial litigation in the State Court Case. (Doc. 47, Appx. Tab 2). A final release and settlement agreement ("Settlement Agreement") was executed on June 22, 2017. (Doc. 47, Appx. Tab 3), providing that, in exchange for one million five hundred thousand dollars

---

[1] Actually, the associated General Partner joined the bankruptcy action later, in 2018.

($1,500,000.00), payable in six equal installments, the Olinger Estate would provide general releases to the following entities/persons ("the Releasees"): Richmond; Richmond Health Facilities-Madison GP, LLC; Preferred Care, Inc. D/B/A Preferred Care of Delaware, Inc.; Kentucky Partners Management, LLC; Preferred Care Partners Management Group, LP; PCPMG, LLC; and Roy T. Baber. (Doc. 47, Appx. Tab 3).

Preferred Care's enterprise-wide General Counsel, Mr. Robert Riek, had directed the Olinger State Court Case litigation on behalf of Richmond, as well as on behalf of State Court Defendant Preferred Care, Inc., and State Court Defendant Preferred Care Partners Management Group ("PCPMG"), LP. (Doc. 47, Appx. Tab 10, Patterson Dep., pp. 20:20-21:6). As revealed in his deposition, Mr. Riek was a manager for Richmond by virtue of being a manager of its General Partner, and presumably made requests for funds on behalf of Richmond in this capacity. Prior to each settlement payment, a "PCI Accounts Payable Manual Check Request" was submitted by a member of Mr. Riek's staff—via an employee of Richmond's management company, PCPMG, LP—requesting funds from an enterprise-wide Preferred Care financial administration company, Facility Support Funding, LLC ("FSF"). (Doc. 47, Appx. Tab 14). Mr. Riek was also a Vice-President of FSF and had control over FSF in this capacity.

FSF administered the enterprise-wide Preferred Care "Cash Management System" for a large number of both debtor and non-debtor Preferred Care companies. FSF itself is not in bankruptcy. Agents of Richmond's management company, PCPMG, LP, including the latter's Chief Financial Officer, Mr. Thomas Patterson, undertook the administration of the Cash Management System and the management of the financial operations of 100+ Preferred Care nursing home facilities that were members of the System. (*See* Doc. 46, Toppi Affidavit, ¶4;

Doc. 27, Appx. Tab 2, Patterson Affidavit ¶1; Doc. 47, Appx. Tab 10, Patterson Dep., pp. 12-14). Mr. Patterson was also deposed in this case, testifying with regard to the Cash Management System explaining that the revenues of the 100-plus operating entities were collected, commingled, and transferred to pay down an established communal line of credit from Wells Fargo Capital Finance ("Wells Fargo"). This line of credit went from Wells Faro to Preferred Care, Inc. and was held, controlled, and operated by FSF in an FSF account that funded the enterprise's entire operations. Revenues from the facilities were automatically swept to a concentration account in the name of FSF. (Doc. 47, Appx. Tab 10, Patterson Dep., pp. 16:15-23). Richmond lacked legal title to the concentration account, as well as to FSF's line of credit account. (Doc. 47, Appx. Tab 10, Patterson Dep., pp. 16:24-17:1). That is, FSF, and only FSF, had legal title to the account in question.

The first installment check for $250,000.00, dated July 28, 2017, was sent outside of the ninety (90) day bankruptcy preference window and is not at issue. For the two installment payments at issue below (totaling $500,000), checks of $250,000.00 each were sent on August 28, 2017 and September 29, 2017, respectively. (Doc. 47, Appx. Tab 9). The two post-settlement payments at issue came in the form of a check that has "Madison Health & Rehabilitation Center"—the d/b/a name of Richmond—in the upper left-hand corner. Each check was drawn on FSF's Wells Fargo Bank account ending in 6797. (Doc. 47, Appx. Tab 9).

The processing of the check requests referenced above, and their respective treatment within the Cash Management System, were as follows:

- With regard to each check, PCPMG recorded (a) a legal expense for $250,000 and (b) an amount payable to Wilkes & McHugh for $250,000 on Richmond's books and records;

- FSF borrowed the funds (collectively, the $500,000 at issue) from the Line of Credit, lending said funds to Richmond;

- FSF prepared the checks (the two $250,000 checks) on an FSF bank account;

- PCPMG reflected on Richmond's books and records that the Richmond accounts payable to Wilkes & McHugh, P.A. was satisfied;

- PCPMG reflected on Richmond's books and records that the accounts payable (that was owed to Wilkes & McHugh, P.A.) was replaced with an identical amount due to FSF;

- Richmond's own funds were ***not*** used to satisfy the payments made to Wilkes & McHugh, P.A.

(Doc. 46, Toppi Affidavit, ¶21).

Ultimately, Richmond's balance sheet was unaffected by these transactions. *Id.* at ¶23. Specifically,

> Before each individual $250,000 payment was processed, Richmond owed the Olinger Estate $250,000. Afterwards, Richmond owed FSF $250,000 instead of the Olinger Estate. Richmond's asset balances, including its cash balances, were unaffected by each $250,000 payment transaction.

*Id.*

This replacement of one creditor for another, in the exact same amount, was confirmed by Mr. Patterson. (Doc. 47, Appx. Tab 10, Patterson Dep., p. 32:9-15). The journal entries accounting for the funds at issue represented merely a simultaneous bookkeeping transaction where the payment of checks out of FSF's account were noted to satisfy a debt of Richmond. (Doc. 47, Appx. Tab 10, Patterson Dep., p. 51:12-22). In other words, each check satisfying a $250,000 obligation to the Olinger Estate was replaced by a $250,000 obligation ***to FSF***. (Doc. 47, Appx. Tab 10, Patterson Dep., p. 56:4-20).

In addition to lacking legal title to the monies in the FSF account, Richmond also lacked the ability to make withdrawals from that account. (Doc. 47, Appx. Tab 10, Patterson

Dep., pp. 17:16-23; 66:12-25). The entity of control over that account and legal owner, was a non-debtor, non-party—FSF. (Doc. 47, Appx. Tab 10, Patterson Dep., p. 67:1-3). Richmond produced no evidence indicating that FSF had any contractual duty to direct said monies at the behest of Richmond.

### B. Bankruptcy Court Order

On August 8, 2019, Richmond initiated an adversary proceeding seeking to avoid and recover alleged preferential transfers, *i.e.*, the transfers totaling $500,000 made within the ninety (90) day bankruptcy preference window. (Doc. 1). First and Second Amended Complaints were later filed to add party-defendants from whom recovery was sought (Docs. 5, 13). Movants herein filed Answers to the Complaints and asserted defenses to Richmond's entitlement to recovery under the Bankruptcy Code, including, *inter alia*, that (1) the transfers at issue were not of an interest of Richmond in property; and that (2) Richmond's claims are legally insufficient under the Earmarking Doctrine.

On December 6, 2019, Richmond filed a Motion for Summary Judgment (Doc. 26) and Brief in Support, along with an affidavit and appendix (Doc. 27), seeking a summary determination that the alleged transfers at issue were of an interest in property of Richmond. As Richmond put the issue, "[w]as the $500,000 paid through the Debtors' Cash Management System property in which Richmond owned an interest pursuant to § 547 of the Bankruptcy Code?" (Doc. 21 at p. 2).

In order to void any of the post-settlement payments, Richmond had the burden of proof that they constituted transfers "of an interest of the [Plaintiff] in property." 11 U.S.C. § 547(b); *see also Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355 (5th Cir. 1986). The Fifth Circuit has repeatedly recognized that a bankruptcy court's determination regarding

whether the property transferred was "of an interest of the debtor in property" essentially turns on the level of control the debtor had over the account from which the funds flowed, and the level of control the debtor had over the funds themselves. *See Southmark Corp. v. Crescent Heights VI, Inc. (In re Southmark Corp.)*, 95 F.3d 53, 57 (5th Cir. 1996) (holding "[w]hile it is true that the debtor's control of property may be such that the property is properly considered part of the debtor's estate in bankruptcy, our decisions make it clear that such control must be unfettered and without restriction."). It is worth noting again here that the monies being paid in settlement were not only paid on behalf of Richmond at Mr. Riek's behest, but also to settle the claims against others (the Releasees), also at Mr. Riek's behest.

Additionally, Movants in this case affirmatively asserted application of the Earmarking Doctrine, as precluding Plaintiff's preference claim, arguing that *if* it could be said that Richmond received funds from FSF, such funds were extended solely for the purpose of paying Movants in the State Court Case pursuant to the Settlement Agreement, and for no other reason. "The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor ***and therefore payment of these assets to a creditor in no way diminishes the debtor's estate***." *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 13556 (5th Cir. 1986) (emphasis added). Specifically, "[i]f all that occurs in a 'transfer' is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed." *Id.* at 1356.

Yet, citing to *In re Entringer Bakeries, Inc.*, 548 F.3d 344 (5th Cir. 2008), and thereby to *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351 (5th Cir. 1986), the court below stated (emphasis added),

> [b]ut ***the doctrine does not apply*** in the Fifth Circuit ***when the debtor has discretion*** to determine which creditors to pay with the new loan proceeds. The new lender's knowledge or understanding that a loan will be used to pay a particular creditor is not sufficient; there must be an agreement or other restriction that requires the debtor to use the new loan proceeds to pay a particular creditor. In this case, there is no evidence that FSF required that any particular creditor be paid with the loan proceeds; to the contrary, Mr. Patterson's affidavit shows without contradiction that "FSF does not independently determine which Richmond creditors get paid nor determine how much a Richmond creditor gets paid." The earmarking doctrine does not apply under these facts.

(Doc. 56, Order at p. 21).

In sum, the Bankruptcy Court concluded:

2. The following elements of 11 U.S.C. § 547 are established for purposes of trial:

   a. the alleged transfers at issue were of an interest in property of Richmond;

   b. each transfer was made within ninety days of the Petition Date;

   c. the transfers were made while Richmond was insolvent;
   d. the transfers were made for or on account of an antecedent debt owed by Richmond to the Olinger Estate before such transfers were made;

   e. the transfers allowed the Olinger Estate to receive more than it would have received if (i) Richmond's case were a case under Chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the Olinger Estate received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

3. All issues related to 11 U.S.C. § 550 are reserved for trial.

(Doc. 56, Order at pp. 24-25).

## II. QUESTIONS OF LAW AND RELIEF SOUGHT

**WERE THE FUNDS COMING FROM FSF AND PAID DIRECTLY TO THE OLINGER ESTATE—NEVER PASSING THROUGH ANY ACCOUNT SEPARATELY OWNED BY RICHMOND—EVER PROPERTY OF RICHMOND'S BANKRUPTCY ESTATE?**

**FOR PURPOSES OF THE EARMARKING DOCTRINE, DOES A LENDER HAVE ULTIMATE CONTROL, AS TO WHAT PURPOSE A LOAN IS PUT, WHEN THE BORROWER AND THE LENDER ARE MANAGED BY THE SAME PERSON?**

Movants request that this Court grant interlocutory appeal to determine (1) whether the funds paid to Movants ever constituted an interest of Richmond in the alleged preference property; and (2) whether these funds ostensibly borrowed by Richmond, and paid by lender, solely for the purpose of paying Movants, thereby triggered the Earmarking Doctrine.

## III. REASONS TO GRANT LEAVE TO APPEAL

The Bankruptcy Court's Order disposed of five of the seven issues in front of the court on summary judgment. (Doc. 56, Order at pp. 14, 24-25) Because that court left the 11 U.S.C. § 550 issues open for trial, its Order did not resolve any ultimate question of Movants' liability, or upset the substantive *status quo ante*. Nonetheless, the procedural milestones regarding debtor's property and earmarking are prime candidates for an interlocutory appeal.

This Court may, in its discretion, grant leave for interlocutory appeal on these issues now. 28 U.S.C. § 158(a)(3); *see also Stumpf v. McGee* (*In re O'Connor*), 258 F.3d 392, 399–400 (5th Cir. 2001) ("[T]he decision to grant or deny leave to appeal a bankruptcy court's interlocutory order is committed to the district court's discretion"). The Fifth Circuit has not expressly adopted criteria for determining whether to grant leave for an interlocutory appeal under 28 U.S.C. § 158(a)(3), but it has recognized that district courts commonly use the standard applied

under 28 U.S.C. § 1292(b) for interlocutory appeals to the federal courts of appeals. *See Ichinose v. Homer National Bank*, 946 F.2d 1169, 1177 (5th Cir. 1991).

Section 1292(b) provides for interlocutory appeal in exceptional circumstances, when an interlocutory order satisfies three criteria: (1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion as to that question; and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. *Id.* Those standards are met here.

The Order involves controlling issues of law, and there is substantial ground for difference of opinion on the earmarking issue, or whether the FSF "loans" were ever even Richmond property. Moreover, this case presents a circumstance where an immediate appeal will materially advance the ultimate termination of the litigation. If the $500,000 constituted earmarked funds—or were never even Richmond's funds in the first place—then trial would be unnecessary to determine whether Movants and bankruptcy court Defendant O'Brien & Kirtley, PLLC were initial or subsequent transferees under 11 U.S.C. § 550.

In order to succeed on summary judgment that the funds in question were Richmond's property and under its control, Richmond had to "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). This, Richmond did not do. Additionally, when a borrower and lender are directed by the same persons, can it be said that the loan is extended for an earmarked purpose put forth by the lender? Yes it can. The bankruptcy court's contrary determination that the borrower Richmond retained discretion as to what purpose to put the funds is unsupported by the facts presented.

Notably, the bankruptcy court failed to discuss or even note the existence of Movants' rebuttal evidence in the form of an expert opinion affidavit from forensic accountant Mr. Vincenzo Toppi. It is of course not the purview of a trial court to weigh evidence or witness credibility at summary judgment, and the bankruptcy court violated that prohibition by overlooking Movants' evidence. Indeed, the bankruptcy court did not offer anything on whether it considered Mr. Toppi's affidavit invalid, incredible, or insubstantial. Although comprehensive findings of fact and conclusions of law are not absolutely required in grants of summary judgment in federal trial courts, sufficient explanation of such a grant is preferable. *See Vadino v. A. Valey Engineers*, 903 F.2d 253, 259 (3d Cir. 1990) (requiring an explanation for a grant of summary judgment); *see also Grossman v. Berman*, 241 F.3d 65 (1st Cir. 2001) (remand required because basis for bankruptcy court's ruling was not ascertainable from the record). Here, it is simply not clear why the following opinions of Mr. Toppi were unpersuasive in meeting Movants' rebuttal burden:

> Further, to fund amounts to cover the payments to the creditors, PCPMG would draw funds from the Line of Credit and those borrowed Line of Credit funds were deposited in an FSF bank account. They were *not* transferred to a Richmond bank account. Richmond did not have any bank account in its own name that was used by pay its creditors.

(Doc. 46, Toppi Affidavit ¶ 13).

> In connection with the processing of the check, PCPMG would draw a check on the FSF bank account and that check was forwarded to Richmond's creditor. While the check may have reflected Richmond's d/b/a name (or the d/b/a name of one of the other affiliated partnerships), all of the checks were drawn on an account owned, controlled and operated solely by FSF. Indeed, there is no evidence to establish that Richmond had control over the funds deposited into the FSF account.

(Doc. 46, Toppi Affidavit ¶ 14).

> While Richmond could request a check for any amount, those requests were effectively "approved" by PCPMG. As Thomas Patterson testified, FSF would

> raise a "red flag" if it were requested to make certain payments outside of the ordinary course. PCPMG would not issue a check simply because it was requested, PCPMG vetted the check requests.

(Doc. 46, Toppi Affidavit ¶ 17).

> Likewise, when Richmond requested FSF to pay a creditor, the transaction (a) reduced Richmond's account payable, and (b) created a new account payable to FSF (instead of the creditor). Richmond's balance sheet was unaffected by the transaction. Before each individual $250,000 payment was processed, Richmond owed the Olinger Estate $250,000. Afterwards, Richmond owed FSF $250,0000 instead of the Olinger Estate. Richmond's asset balances, including its cash balances, were unaffected by each $250,000 payment transaction.

(Doc. 46, Toppi Affidavit ¶ 23).

In short, Richmond did not meet its burden to show as a matter of law that it had unrestricted, unfettered control over FSF's loan money, such that the money constituted an interest in property. *See In re Southmark Corp.*, 95 F.3d 53  Even if it did, Movants rebutted this point with substantial evidence. Richmond, of its own, held no such money.

Notably in *Matter of Southmark Corp.*, 49 F.3d 111 (5th Cir. 1995), the Fifth Circuit held that a debtor had an interest in property in the money paid from a co-mingled account like the one at issue here, sufficient to sustain a bankruptcy preference action, ***because*** the debtor had legal title over the account. Again, Richmond held no legal title over the account in question here (FSF held that title), and again, there was no proof of any FSF obligation to pay anything on Richmond's demand.

> The check paid to Grosz was drawn on [Debtor] Southmark's Payroll Account, a general bank account containing commingled funds, ***to which [Debtor] Southmark held complete legal title***, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its own creditors. The last point is particularly important, as the primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment.

*Id.* at 116-117 (emphasis altered).

If, to point out a counter-factual, Richmond had had legal title to the FSF account, then the entirety of that of account would have to have been potentially considered part of Richmond's bankruptcy estate. It has never been so considered.

As to the question of earmarking, "but for" the Olinger Settlement Agreement, the loans in question would not have been credited to Richmond's account. This fact is undisputed. Whether or not the lender in this instance consisted of FSF, LLC—the holder of legal title to the monies—or all the Preferred Care facilities participating in the Cash Management System—the result is the same. It cannot be said that the lender in this transaction was Wells Fargo. Wells Fargo never made a decision to lend to Richmond, but rather acted solely pursuant to the Cash Management System agreed to, with FSF and with the Preferred Care enterprise.

> When a draw needs to be made, PCPMG Consulting employees (as agents for FSF) make aggregate requests to Wells Fargo to cover the obligations of "all entities within the Preferred Care Group" and the funds are then deposited into the FSF A/P Account. There are no written policies and procedures that govern what needs to be included in a request for loaned funds to be sent to the FSF A/P Account. ***Wells Fargo does not even know on whose behalf within the Preferred Care Group the request for funds is being made.***

(Doc. 56, Order at p. 6) Moreover, all of the entities involved in the Cash Management System were liable on the borrowed funds. (*Id.*) This means that, while the ultimate source of money was Wells Fargo, the lender to Richmond was FSF or "the entities involved in the Cash Management System."

Other Circuits have held that the Earmarking Doctrine applies where there is,

(1) the existence of an *agreement* between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt,

(2) *performance* of that agreement according to its terms, and

(3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) ***does not result in any diminution of the estate***.

*In re Bohlen Enters., Ltd.*, 859 F.2d 561, 566 (8th Cir. 1988); *see also In re Flanagan*, 503 F.3d 171 (2d Cir. 2007); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382 (3d Cir. 2009); *In re Lee*, 530 F.3d 458 (6th Cir. 2008); *In re Montgomery*, 983 F.2d 1389 (6th Cir. 1993); *Matter of Smith*, 966 F.2d 1527 (7th Cir. 1992); *In re Heitkamp*, 137 F.3d 1087 (9th Cir. 1998).

Under the *Bohlen Enterprises* criteria, the only thing at issue here is whether there was an agreement between the lender, FSF, and the borrower, Richmond, as to what purpose the money lent was to be put. The simple fact is that the same person controlled the loan on both sides of the transaction—Mr. Robert Riek. Thus there was an implied, but ironclad, agreement existing in the intentions of the Preferred Care managers to put the money to paying pursuant to the Settlement Agreement. They borrowed the money from themselves and paid that money per the Settlement Agreement.

Mr. Riek made a decision to pay off the debt to the Olinger Estate on the credit of all the entities of Cash Management System. He did not make a decision to simply loan money to Richmond with the expectation that he (Robert Riek) would ***probably*** use it to pay the Olinger Estate. Robert Riek ***made the decision*** as an officer of both the borrow-debtor Richmond ***and*** the lender, either in effect on behalf of FSF or on behalf of the other facilities participating in the Cash Management System.

The bankruptcy court's determination the Richmond had discretion in connection with the loan from FSF—a loan that Robert Riek approved at Robert Riek's request—is unexplained and unsupported. Of note, *Coral Petroleum, Inc.* teaches this:

> [Even] [w]here the debtor physically receives control of the funds, there can still be an "earmark," *see* 4 *Collier*, *supra*, ¶ 547.25…. Demonstrating ***the third party's-intent*** is one way of doing this….

*Coral Petroleum, Inc.*, 797 F.2d at 1361 (emphasis added).

Again, it is undisputed that **FSF**, a third party, made the alleged loan to Richmond. There can be no dispute that such a loan was extended for the sole purpose of satisfying partially the claims of a designated creditor, the Olinger Estate, when those claims came due (vis-à-vis all the Releasees). In this instance, when Mr. Riek requests a loan on behalf of an entity he manages, for a particular purpose from an entity over which he also has control, presumably he is bound to use the loan for the purpose he has stated. When decision-makers "are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (internal citations omitted). Mr. Riek earmarked the funds.

The satisfaction of the partial claims of the Olinger Estate was offset, dollar for dollar, with claims now owed by Richmond to New Creditor FSF. These funds were clearly earmarked by FSF to pay the Olinger Estate when FSF alone processed the check requests and cut the checks to pay the Olinger Estate. In fact, PCPMG, on behalf of FSF, would vet check requests to ensure the amount requested matched a debt owed to a particular creditor and that the payee was clearly designated. (Doc. 46, Toppi Affidavit ¶ 17). For example, if a request included a substantial amount out of the ordinary course, or was not designated for a particular creditor, a "red flag" would be raised before any money was transferred by FSF. (*Id.*).

Richmond failed to carry its burden at the summary judgment stage to show any interpretation of the facts which could give rise to recovery under § 547. "The primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment." *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 595 (5th Cir. 1996). Richmond is out nothing that it possessed prior to the Settlement

Agreement. FSF is out the $500,000, but bankruptcy debtor Richmond's creditors do not have claims against FSF, nor against the other non-debtor entities that are a part of the Preferred Care Group. Movants pray this Court grant leave for this interlocutory appeal.

Dated: June 11, 2020

Respectfully submitted,

*/s/ Robert E. Salyer*
Robert E. Salyer
KY Bar I.D. 91859 (*pro hac vice*)
**Wilkes & McHugh, P.A.**
429 North Broadway
Lexington, KY 40508
rsalyer@wilkesmchugh.com

Colin Esgro
PA Bar I.D. 316947 (*pro hac vice*)
**Wilkes & McHugh, P.A.**
437 Grant Street, Suite 912
Pittsburgh, PA 15219
cesgro@wilkesmchugh.com

Rainey C. Booth
FL Bar. I.D. 1004119 (*pro hac vice*)
**Wilkes & McHugh, P.A.**
One North Dale Mabry Highway, Suite 700
Tampa, FL 33609
rbooth@wilkesmchugh.com

*Attorneys for Defendants*

Michael A. McConnell
Texas Bar I.D. 13447300
Nancy Ribaudo
Texas Bar I.D. 24026066
nancy.ribaudo@kellyhart.com
**Kelly Hart & Hallman LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: 817/332-2500
Telecopier: 817/878-9774

*Local Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

      A true and correct copy of the foregoing document was served on June 11, 2020, upon the below persons via ECF:

Stephen A. McCartin
Mark C. Moore
Melina T. Bales
**FOLEY GARDERE**
**Foley & Lardner LLP**
2021 McKinney Ave., Ste. 1600
Dallas, TX 75201
smccartin@foley.com
mmoore@foley.com
mbales@foley.com

                                       */s/ Michael A. McConnell*
                                       Michael A. McConnell